[Civ. No. 64262. Second Dist., Div. Three. Mar. 17, 1983.]

TAORMINA THEOSOPHICAL COMMUNITY, INC.,
Plaintiff, Cross-defendant and Respondent, v.
ROBERT D. SILVER et al., Defendants, Cross-complainants and Appellants.

COUNSEL

Silver & Walshin, Martin E. Pulverman, Benton, Orr, Duval & Buckingham and Edwin Duval for Defendants, Cross-complainants and Appellants.

Hathaway, Perrett, Webster & Powers and Paul D. Powers for Plaintiff, Cross-defendant and Respondent.

OPINION

KLEIN, P. J.—Defendants, cross-complainants and appellants Robert D. Silver and Esther W. Silver (the Silvers) appeal from a judgment granting the

injunctive relief and attorney's fees sought by plaintiff, cross-defendant and respondent Taormina Theosophical Community, Inc. (Taormina).

We reverse the judgment finding that the covenant restraining ownership of the land is unenforceable as an illegal restraint on alienation and that the covenant restraining ownership violates Civil Code section 53, subdivision (b).

### PROCEDURAL BACKGROUND

Taormina filed its first amended complaint for injunctive relief, damages and a declaration of rights on May 15, 1980, seeking enforcement in equity of certain provisions in covenants, conditions and restrictions (CCRs) recorded August 8, 1977, by Taormina and allegedly breached by the Silvers.[1]

On June 25, 1980, the Silvers filed an answer and a cross-complaint for declaratory relief and cancellation of the CCRs.

Following trial, injunctive relief was granted as prayed and attorney's fees were awarded. Judgment was entered December 8, 1980, and a timely appeal followed.

### FACTS

Taormina is a nonprofit California corporation organized for the purpose of establishing a retirement community for Theosophists and certain other qualified persons. Theosophists are members of the Theosophical Society in America (Society). On or about March 17, 1967, Taormina acquired property for that purpose located in Ojai. The property consisted of two tracts, 1956 and 2446. Tract 1956 was serially developed in three sections, after which tract 2446 was developed.

On April 17, 1968, Taormina recorded CCRs covering all the purchased property, which CCRs included inter alia a right of first refusal retained by Taormina.

On January 18, 1969, Taormina conveyed property described as lot 19 of tract 1956-1 to K. H. Weiland which property was subject to the CCRs.

On August 8, 1977, Taormina recorded duly ratified amendments to the CCRs which contained a provision limiting ownership and occupancy in tracts 1956-1-2-3 of Taormina to persons (1) who had been members of the Society for three years, or (2) in exceptional cases, who had been members for less than

---

[1]This complaint was identical to the original one except that it deleted reference to CCRs dated November 9, 1977, and instead relied on CCRs dated August 8, 1977.

three years, but had been approved by Taormina's board of trustees, and (3) who were 50 years of age or over. The land in tract 2446 was not covered by these CCRs.

On November 9, 1977, new CCRs were recorded, which had not been duly ratified. These CCRs were identical to those recorded August 8, 1977, in all but two respects. The first difference concerns an irrelevant lien provision, but the new CCRs purported to change the scope of the ownership restriction by deleting the reference to tracts 1956-1-2-3 and making it applicable only to tract 2446.[2]

On November 22, 1977, an unratified document of clarification was recorded relating to tract 1956-1. This document stated that the November 9, 1977 CCRs were intended to supersede prior restrictions.

On November 10, 1978, the trustees of the trust for K. H. Weiland transferred the property located on lot 19 of tract 1956-1 to the Silvers.

At the time the Silvers acquired the property together, both had actual knowledge of the CCRs recorded August 8, 1977; neither was a member of the Society, although Esther joined later, nor was either granted an exception to the ownership or occupancy requirements; Esther was 70 years old and Robert was under 50; and neither had any knowledge of the unratified documents recorded November 9 and 22, 1977.

Robert was an attorney who had represented other members of Taormina, as well as the trustee of the trust from which the Silvers acquired title.

The trial court determined that the Theosophical Society was not a religion, that the restrictions as to ownership and occupancy did not discriminate on the basis of race, color, creed or religious preference, and that the right of first refusal set forth in the CCRs was validly passed and duly enforceable against the Silvers.

## CONTENTIONS

The Silvers set forth a number of reasons why each of several conclusions of the trial court was incorrect. We shall discuss only those arguments that actually dispose of each issue.

The Silvers' first point is that the trial court erred in refusing to give effect to the November 9th CCRs and the November 22d document of clarification.

---

[2]The Silvers claim this change worked to exclude their property which was located in tract 1956-1.

They contend that the recording statutes and Corporation Code section 313 made the documents legally binding and in any case, that waiver and estoppel prevent the enforcement of the ownership requirement.

They also argue that the ownership provision, if applicable to their property, constitutes an illegal restraint on alienation.

The Silvers also aver that Civil Code section 53, which prohibits restrictive covenants based on religion, renders both the ownership and the occupancy requirements void.

The Silvers go on to attack the trial court's conclusion that the right of first refusal is enforceable, arguing that it violates the rule against perpetuities.

Finally, the Silvers contend that a provision regarding subleasing and the residency of children is invalid.

## DISCUSSION

### 1. *The August CCRs control over those recorded November 9, 1977.*

The threshold issue is whether the trial court erred in finding that the November 9 CCRs had no legal effect because they were not ratified by the membership. The Silvers claim that the document must be considered binding since it was executed by corporate officers and duly recorded. If the November 9 CCRs were indeed binding on the parties, a reversal would be dictated because the ownership restriction, by its own terms, would not apply to the Silvers' property. However, they are not binding and therefore the August CCRs control.

Generally, restrictive covenants may be modified by less than all affected landowners where the original scheme of restrictions contains a provision so authorizing. (See *Sharp* v. *Quinn* (1931) 214 Cal. 194, 197 [4 P.2d 942, 78 A.L.R. 501]; Rest., Property, § 554 com. e.) The procedure established in the provision must be followed for the modification to be binding. While an individual can give up his or her own rights under a covenant, such individual cannot unilaterally affect the rights of others. (See *Robertson* v. *Nichols* (1949) 92 Cal.App.2d 201, 206 [206 P.2d 898].)

The August 8 CCRs provide for amendment by the vote of 75 percent of lot owners. The trial court found that 75 percent of the owners had not approved the changes embodied in the November 9 CCRs. The changes therefore are not enforceable and to the extent that they purport to make such changes, the November 9 CCRs are void.

2. *Corporations Code section 313 inapplicable.*

The Silvers contend however that Corporations Code section 313 prevents us from considering lack of ratification. Corporations Code section 313 provides that a written instrument signed by corporate officers "is not invalidated as to the corporation by any lack of authority of the signing officers in the absence of actual knowledge [by the other party to the instrument]."

■ Its purpose, as set forth in the legislative committee comment is "to allow third parties to rely upon the assertive authority of various senior executive officers of the corporation concerning the execution of any instrument *on behalf of the corporation.*" (Legis. Committee com., West's Ann. Corp. Code, § 313 (1977 ed.) p. 254; italics added.) Such extra protection for third parties who deal with corporations is warranted since corporations necessarily act through agents.

Here, the Taormina officers were not acting just on behalf of the corporation when they filed the November 9 CCRs; they were acting on behalf of the individual landowners in the community as well. Therefore, the policy of protecting those dealing with corporations is not applicable, and Corporations Code section 313 is not controlling.

3. *The mere act of recordation did not make the November CCRs enforceable.*

■ Despite the Silvers' further contention, the *act* of recording the November 9 CCRs did not make them enforceable. The purpose of recording is to protect innocent purchasers and encumbrancers of property by giving notice of potential limitations on title. (*U. S. Hertz, Inc.* v. *Niobrara Farms* (1974) 41 Cal.App.3d 68, 85 [116 Cal.Rptr. 44].) Recording itself grants no interest in the property (*ibid.*), and a void document "derives no validity from the mere fact that it is recorded." (*City of Los Angeles* v. *Morgan* (1951) 105 Cal.App. 2d 726, 733 [234 P.2d 319].) Therefore, the otherwise void November 9 document was not made binding on the parties simply because it was recorded.

A different case would be presented if the Silvers actually had been misled by the recorded documents as to the limitations on their land. In such a case, equity might require enforcement of the provisions despite their invalidity. However, the Silvers knew the property was restricted and were not aware of the limiting provisions of the November 9 document. Any doubts about the enforceability of the covenants stemmed from their content, and not from the state of the record title. Therefore, considerations of equity do not require that the November 9 CCRs be given effect.

## 4. *Enforceability of the CCRs.*

Having decided that the August 8 CCRs control, the next issue is whether the restrictions contained therein are enforceable against the Silvers' property. ▮ Since the Silvers were not parties to the agreement to restrict the land, *the covenants are only enforceable if they run with the land or if they create an equitable servitude.*

▮ ▮▮▮ Whether the covenants run with the land and bind the Silvers as remote grantees is controlled by Civil Code section 1462[3] which provides that "[e]very covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land." ▮ Only the benefit of a covenant runs; covenants which burden the covenantee/grantee's land will not bind subsequent transferees.[4] (*Marra v. Aetna Construction Co.* (1940) 15 Cal.2d 375, 378 [101 P.2d 490]; *Ross v. Harootunian* (1967) 257 Cal.App.2d 292, 294 [64 Cal.Rptr. 537].)

Both the ownership and the occupancy restrictions in question burden the land. Assuming arguendo that the land values in the Taormina community may be increased by the existence of the restrictions, that benefit flows to each landowner from the fact that others' lands are burdened. It does not flow from the limitation on one's own land. (Cf. *Ross v. Harootunian, supra,* at p. 294), (building restrictions, which provide a general benefit to the neighborhood, found burdensome and unenforceable as a covenant).) Because the ownership and occupancy restrictions burden the Silvers' land, the covenants do not run.

▮ Covenants that do not run still may be enforced as equitable servitudes. (*Marra v. Aetna Construction Co., supra,* 15 Cal.2d at p. 378.) "Even though a covenant does not run with the land, it may be enforceable in equity against a transferee of the covenantor who takes with knowledge of its terms under circumstances which would make it inequitable to permit him to avoid the restriction." (*Ibid.*)

---

[3]Civil Code section 1468 which also describes when a covenant will run, is not applicable to this case. In 1969, when Taormina first sold the property, this section only applied to restrictive or burdensome covenants between two landowners or to covenants which burden the grantor's land. These covenants burden the grantee's land. Although the statute has been amended to cover this situation, it would not be proper to give the amendment retroactive application. (See *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393 [182 P.2d 159]; *Santa Monica Community College Dist.* v. *Public Employment Relations Bd.* (1980) 112 Cal.App.3d 684, 689 [169 Cal.Rptr. 460] ("[S]tatutes are not to be applied retroactively unless it clearly appears that such was the legislative intent.").)

[4]There is some question as to whether the burden on the covenantor/grantor's land, which corresponds to the benefit on the covenantee/grantee's land, will be enforced against subsequent takers of the grantor. For a discussion of this issue see Note, *Covenants and Equitable Servitudes in California* (1978) 29 Hastings L.J. 545, 555.

In addition to notice and a general sense of fairness, a number of technical requirements now restrain the finding of equitable servitude. (See generally *Trahms* v. *Starrett* (1973) 34 Cal.App.3d 766, 770-771 [110 Cal.Rptr. 239].) All the technical requirements were met by the August 8 document. Additionally, the trial court made an explicit finding that notice, the key to equitable enforcement, existed. Under these circumstances it is usually proper to enforce a servitude and a decision to do so will only be reversed if it is an abuse of discretion.

a. *Ownership restriction is an illegal restraint on alienation.*

The Silvers contend, however, that the contested restrictions violate various statutes. An illegal restriction will not be enforced as a servitude (*Doo* v. *Packwood* (1968) 265 Cal.App.2d 752, 755 [71 Cal.Rptr. 477]), and it would be an abuse of discretion to so hold. The Silvers claim that the covenant limiting *ownership* to members of the Society is unenforceable as it is a restraint on alienation in contravention of Civil Code section 711.[5][6]

Although at one time this section was construed to prohibit all restraints on alienation regardless of degree or duration, it is now settled that only unreasonable restraints are invalid. (*Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 948 [148 Cal.Rptr. 379, 582 P.2d 970]; *Laguna Royale Owners Assn.* v. *Darger* (1981) 119 Cal.App.3d 670, 682 [174 Cal.Rptr. 136].) In determining whether a restraint is unreasonable, the court must balance the justification for the restriction against the quantum of the restraint. The greater the restraint, the stronger the justification must be to support it. (*Wellenkamp* v. *Bank of America, supra,* 21 Cal.3d at p. 949.) Factors to be considered include the number of people excluded and the effect of the exclusion of that particular group. (Rest., Property, § 406, com. j.)

On balance, we find that the covenant restricting *ownership* of land in Taormina to Theosophists older that 50 is unreasonable. The quantum of restraint in this case is very great. Southern California is a highly desirable place to live and people from all over the country seek to buy property here. In contrast to a vast potential market, the number of Theosophists in the United States is exceptionally small.[7]

---

[5]Civil Code section 711 provides: "Conditions restraining alienation, when repugnant to the interest created, are void."

[6]The August 8 CCRs is a lengthy four-part document which regulates such diverse matters as street maintenance and housing design. Part II, which is captioned "Ownership Requirements," contains the provisions at issue in this case. Part II-1 sets forth the limitations in ownership; part II-2 limits occupancy of land in Taormina and part II-5 discusses the right of first refusal.

[7]We note that according to evidence adduced at trial the Theosophical Society only has 6,000 members nationwide. The number of persons who have been members for more than three years is even smaller and this number is reduced further when only those people over fifty are counted.

The purpose of the restriction is to insure that those who settle in Taormina are sincere in their commitment to Theosophy. Taormina was expressly developed as a retirement community for people who share interests in the study of comparative religions and the latent powers of men. While the gathering together of like minded people may be a laudable goal, such purpose is not sufficient to sustain the heavy burden on alienability.

The covenant contained in part II-1 of the August 8 CCRs is therefore an unreasonable restraint of alienation and void under Civil Code section 711.

b. *Although Theosophy is not a religion, the occupancy restriction violates the intent and spirit of Civil Code section 53.*

The restriction contained in part II-2 limits those who may *occupy* property in the community. ■ Although restrictions on use by certain groups may affect the marketability of land, they are not considered restraints on alienation. (*Los Angeles Investment Co.* v. *Gary* (1919) 181 Cal. 680, 682 [186 P. 596, 9 A.L.R. 115]; *Mountain Brow Lodge, I.O.O.F.* v. *Toscano* (1967) 257 Cal. App.2d 22, 25-26 [64 Cal.Rptr. 816].) In general they may be enforced as equitable servitudes (*Wayt* v. *Patee* (1928) 205 Cal. 46, 51 [269 P. 660]); however, the Silvers' claim that this occupancy requirement violates Civil Code section 53 subdivision (b).

■ At trial, the Silvers sought to prove that Theosophy was a religion and that the restriction therefore was void under the express terms of Civil Code section 53 subdivision (b).[8] Civil Code section 53 subdivision (b) renders void use or occupancy restrictions based on race, ethnicity, sex or religion.

There was strong evidence to support a contrary finding but the trial court found that Theosophy was not a religion and that the restrictions did not discriminate on the basis of race, color, creed or religion. Although each of these findings is supported by substantial evidence and is therefore binding on this court (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Carazo* v. *Lopez* (1980) 112 Cal.App.3d 319, 322 [169 Cal.Rptr. 182]), these findings do not dispose of the problem. Rather, they raise the issue as to whether the section prohibits restrictions based on the enumerated criteria only, or whether the statute's reach is broader.

This issue is one of first impression. We believe that a reasonable reading of the section calls for the conclusion that the itemization is not exclusive and that

---

[8]Civil Code section 53, subdivision (b) reads in pertinent part: "(b) Every restriction . . . , whether by way of covenant, . . . or upon transfer of title to real property, which restriction . . . directly or indirectly limits the acquisition, use or occupation of such property because of the acquirer's, user's, or occupier's sex, race, color, religion, ancestry, or national origin is void."

occupancy restrictions based on membership in this theosophical organization are forbidden under Civil Code section 53 subdivision (b).

There has been a steady trend, both in the Legislature and in the courts, to extend the protections afforded against discrimination based on *irrelevant criteria*. These extensions have covered both new areas where discrimination can take place (e.g., the granting of franchises)[9] and the new classes of people (e.g., families with children).[10] The broadest of the recent protections is found in the Unruh Act, which has been construed to prohibit all arbitrary discrimination by business enterprises. (*In re Cox* (1970) 3 Cal.3d 205, 212 [90 Cal.Rptr. 24, 474 P.2d 992].) Although not part of the Unruh Act which is contained in Civil Code sections 51 and 52, section 53 clearly was enacted to effectuate the same general goals as part of the same trend.

We note that a property owner's right to control property through deed, covenant or condition has never been absolute (see, e.g., Civ. Code, § 710, prohibiting conditions in restraint of marriage), although historically, owners have been given latitude in the control and use of land. (See, e.g., *Mountain Brow Lodge, I.O.O.F.* v. *Toscano, supra,* 257 Cal.App.2d 22, 25 [condition limiting use of land to fraternal organization upheld]; Gov. Code, § 12995, subd. (c) [preserving landlord's right to choose tenants using nonlisted factors].)[11]

Private property rights have always been limited by the imperatives of the public good. (See *Village of Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]; Powell, *The Relationship Between Property Rights and Civil Rights* (1963) 15 Hastings L.J. 135, 142-145.) We therefore need not resist the trend towards expanding protections against arbitrary discrimination simply because we are dealing with land.

The scope of Civil Code section 53 is both broad and comprehensive. It interdicts discrimination in leasing and mortgaging as well as in conveyancing. Indirect as well as direct restraints are forbidden. The overlapping provisions of subdivisions (a) and (b) evidence a legislative desire to insure that no gaps in coverage exist. Restrictive reading of the prohibited bases of discrimination would be at odds with the all-inclusive scope of its coverage.

In accordance with the spirit of the statute, we interpret Civil Code section 53 subdivision (b) as prohibiting all covenants on land that would discriminate on bases similar to those listed.

[9]See Civil Code section 51.8, passed in 1980.

[10]See *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115].

[11]We make the observation that the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) is not directly applicable to the case at hand. The act deals with the voluntary decision of a landlord to discriminate in leasing his property. The sole issue before us is the propriety of a covenant which would force a landlord to discriminate in a given way.

The issue then presented is whether the covenant restricting *occupancy* to Society members who had been in the Society for three years or who were approved by the Taormina board is sufficiently close to a restriction based on religion to be void under the statute. We believe that it is.

Like a religion, Theosophy is concerned with spiritual matters; its goals are neither political, economic nor purely academic. The Society has three basic objectives: to work towards the universal brotherhood of man; to study and to compare religions, sciences and philosophies, and finally to explore the psychical powers latent in man. Although Theosophy has no dogma or creed which members must accept, its membership is united by a common belief in the value of its goals.[12]

The apparent function of the occupancy restriction is to exclude those not sharing that attitude. The restriction on use by nontheosophists therefore, operates like a religious restriction in that both discriminate based on a person's sympathy to a set of ideas which are spiritual in nature. By including the word religion in Civil Code section 53, the Legislature indicated that it considered the manner in which a person approaches spiritual matters an improper and irrelevant criterion for denying access to land. Because the restriction here is based on just that sort of criterion, it violates the purpose of the statute and will not be enforced by a court of equity.

c. *Given a limiting construction, the right of first refusal does not violate the rule against perpetuities (the Rule).*

■ Lastly, we consider whether the provision in part II-5, providing for a right of first refusal that "has been negotiated between the parties or to which the property is subject by virtue of its recordation within the County of Ventura" is valid. This provision in and of itself does not create a right of first refusal in Taormina; however, a right was negotiated between Taormina and K. H. Weiland, the Silvers' predecessor-in-interest.

The Silvers contend that the right of first refusal as granted violates the Rule. The Rule invalidates any property interest which will not be certain to vest within the time of a life in being at the creation of the interest plus 21 years.

---

[12]At trial Taormina's position was that membership in the Society is ideologically neutral, and that payment of $15 was the only qualification for membership. Even accepting this as true, we would deny equitable enforcement of the occupancy restriction. The courts will not enforce equitable servitudes where to do so "would have no other result than to harass or injure the defendant, without benefiting the plaintiff." (*Fairchild* v. *Raines* (1944) 24 Cal.2d 818, 826 [151 P.2d 260].) If membership in the Society implies nothing about a person because anyone can or might pay the fifteen dollars, the membership requirement is a meaningless formality. As such Taormina derives no particular benefit from it. It would be unjust to force the Silvers to vacate their land, when to do so would benefit no one.

(Civ. Code, § 715.2.) Any interest that is certain to vest within 60 years is valid under the Rule. (Civ. Code, § 715.6.) The function of the Rule is to increase the alienability of land by abolishing highly contingent future interests. (Rest., Property, § 370, p. 2140.)

A right of first refusal is a property interest subject to the Rule. (*Al J. Vela & Associates, Inc.* v. *Glendora Unified School Dist.* (1980) 108 Cal.App.3d 444, 449-450 [166 Cal.Rptr. 732].) Therefore, it is necessary to look at the particular terms of the right at the time of its creation to make sure that it is certain to be exercised, or certain not to be exercised, within the Rule period. If there exists even a bare possibility that the interest will not vest, the Rule is violated. (*Estate of Grove* (1977) 70 Cal.App.3d 355, 361 [138 Cal.Rptr. 684].)

The interest negotiated by Taormina purports to run with the land and to be applicable "whenever the property is sold." Taormina, therefore, may assert the interest against remote future grantees. The interest remains unvested even after it is once exercised, since each right of first refusal is a separate right which does not vest until each successive owner decides to sell the property. Unlike other cases, the interest here cannot be limited to the holder's lifetime because corporations have perpetual existence. At first blush the right of first refusal does not appear certain to vest or fail within the Rule period.

However, before finding that Civil Code section 715.2 has rendered the interest void, we are required by Civil Code section 715.5 to construe or reform the document to avoid violating the Rule if it is possible to do so consistent with the creator's general intent. In ascertaining the creator's intent, it is proper to consider the August 8 CCRs, since they gave rise to the interest. By express provision the August 8 CCRs expire on January 1, 1988, although they are also automatically renewed.

We cannot apply the automatic renewal provision to the right of first refusal because it operates to extend the interest's duration beyond the rule period. (Cf., *Beets* v. *Tyler* (1956) 365 Mo. 895 [290 S.W.2d 76] (no violation of Rule because renewals were actually new agreements).) We therefore construe the right of first refusal as expiring on January 1, 1988. So construed, the interest does not violate the Rule and the right of first refusal is enforceable against the Silvers.

d. *Restrictions as to minors not before us.*

The Silvers also ask us to declare that the restrictions on leasing and on occupancy by minors are void. The trial court refused to take evidence or decide the issue. We find that such actions were proper.

Code of Civil Procedure section 1060 permits actions for declaratory relief "in cases of actual controversy." ▮ The decision whether to grant declaratory relief is entrusted to the discretion of the trial court, and will only be reversed for abuse. (*Hannula* v. *Hacienda Homes* (1949) 34 Cal.2d 442, 448 [211 P.2d 302, 19 A.L.R.2d 1268]; *General of America Ins. Co.* v. *Lilly* (1968) 258 Cal.App.2d 465, 471 [65 Cal.Rptr. 750].) Here the Silvers did not plead any facts that would disclose a concrete dispute over these provisions. The trial court did not abuse its discretion in refusing to give declaratory relief on these points.

## Disposition

The judgment below is reversed. Costs and attorneys' fees are awarded to the Silvers as the prevailing parties.

Lui, J., and Danielson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 15, 1983.